## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 1:09-MD-02036-JLK

|  |  |
|---|---|
| IN RE: CHECKING ACCOUNT OVERDRAFT LITIGATION | ) ) ) ) |
| MDL No. 2036 | ) ) ) |

|  |  |
|---|---|
| THIS DOCUMENT RELATES TO: | ) ) ) |
| *Ralph Tornes v. Bank of America, N.A.,* S.D. FL 08-23323-CIV-KING/BANDSTRA | ) ) ) |

### SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT[1]

Plaintiffs, through undersigned counsel, on behalf of themselves and all persons similarly situated, allege the following based on personal knowledge as to allegations regarding the Plaintiffs and on information and belief as to other allegations.

### INTRODUCTION

1.      This is a civil action seeking monetary damages, restitution and injunctive relief from Defendant Bank of America, N.A. ("Bank of America"), arising from its unfair and unconscionable assessment and collection of excessive overdraft fees.

---

[1] All Plaintiffs, other than Ralph Tornes, named in this Second Amended Consolidated Class Action Complaint will voluntarily dismiss other actions they filed and which were previously transferred to this Court upon the written stipulation of Bank of America to the filing of this Second Amended Consolidated Class Action Complaint or, in the absence of such stipulation, upon entry of an Order Granting Leave to File this Second Amended Consolidated Class Action Complaint. Upon such stipulation or Order, all Plaintiffs joining in this Second Amended Consolidated Class Action Complaint waive their rights under 14 U.S.C. § 1407 and *Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998), to later seek remand to the transferor districts in which each Plaintiff filed his or her original Complaints.

2.      In the era of electronic banking and the ubiquitous use of debit card transactions, the assessment of overdraft fees has become a major profit center for many United States banks, including Bank of America.  For years, banks covered customers who occasionally bounced checks and even did so for a time for customers using debit cards, without charging their customers.  Since the early 1990's, however, banks have devised methods to provide overdraft "protection" for customers and charge them in each instance.  A recent FDIC report estimated that overdraft fees represent 74 percent of the total service charges that are imposed on deposit accounts in the United States.  A 2008 FDIC study reports that overdraft fees for debit cards can carry an effective annualized interest rate that *exceeds 3,500 percent*.  Nevertheless, the Consumer Federation of America reports that five of the ten largest banks raised their overdraft fees in the last year.

3.      In 2007, banks collected more than $17 billion in overdraft fees.  That number nearly doubled in 2008, as more and more consumers struggled to maintain positive checking account balances.  *In 2009, banks are estimated to bring in between $27 billion to $38.5 billion in overdraft charges alone.*  As the largest retail bank in the country, Bank of America is among the largest beneficiaries of these staggering charges.

4.      Almost by definition, these fees disproportionately affect the poor, who are most likely to maintain low balances.  Moebs Services, a research company that has conducted studies for the government as well as banks, estimates that 90 percent of overdraft fees are paid by the poorest 10 percent of banks' customer base.  Moreover, these fees have the tendency to create a domino effect, because the imposition of a service charge on an account with a negative balance will make it less likely that the account holder's balance will reach positive territory, resulting in more fees.

5.      Before debit cards existed, banks occasionally extended the courtesy of honoring paper checks written on overdrawn or otherwise deficient accounts for customers who were typically in good standing.  Banks extended this courtesy largely because the third party involved in a sales transaction allowed the customer to pay by check, expecting the funds to be available and the check to clear.  For example, if a customer wrote a check to purchase groceries, the grocery store would only know whether the check cleared *after* the groceries had been purchased.

6.      The same considerations are not present when customers use debit cards.  Banks could simply decline to honor debit or point of sale transactions where accounts lack sufficient funds to execute the transactions.  Retail and service transactions could still be executed if consumers presented an alternative form of payment.  ATM transactions could still proceed if banks provided a warning that an overdraft fee would be incurred, and customers chose to proceed nevertheless.  In fact, until a few years ago, most banks simply declined debit transactions that would overdraw an account.

7.      Instead of simply declining debit transactions when there are insufficient funds, or warning its customers that an overdraft fee will be assessed if they proceed with the transaction, Bank of America routinely processes such transactions and then charges its customers an overdraft fee of $25 (for the first such charge in any calendar year) or $35 (for all subsequent charges)—even when the transaction is for only a few dollars.  This automatic, fee-based overdraft scheme is intentionally designed to maximize overdraft fee revenue for Bank of America.  Additionally, as part of its inequitable motive to generate obscene profits gained through the imposition of unconscionable overdraft fees, Bank of America fails to adequately disclose to its customers that they may elect to opt out of overdraft protection.

8.     In many instances, these overdraft fees cost Bank of America account holders hundreds of dollars in a matter of days, or even hours, when they may be overdrawn by only a few dollars.  Even more egregious, customer accounts may not actually be overdrawn at the time the overdraft fees are charged, or at the time of the debit transaction.

9.     Thus, it is through manipulation and alteration of customers' transaction records that Bank of America maximizes overdraft penalties imposed on customers.

## JURISDICTION AND VENUE

10.    This Court has original jurisdiction of this action under the Class Action Fairness Act of 2005.  Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because the aggregate claims of the putative Class members exceed $5 million, exclusive of interest and costs, and at least one of the Plaintiffs is a resident of a different state than Bank of America.

11.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Bank of America is subject to personal jurisdiction here and regularly conducts business in the Southern District of Florida, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred and continue to occur in this district.

## THE PARTIES

12.    Plaintiff Ralph Tornes is a citizen of the State of Florida.

13.    Plaintiff Jonathan Bylin is a citizen of the State of New Jersey.

14.    Plaintiff Joshua Di Frances is a citizen of the State of Massachusetts.

15.    Plaintiff David Hanny is a citizen of the State of Illinois.

16.    Plaintiffs Esther and Stephen James are citizens of the State of Texas.

17.    Plaintiff Nelson Norman is a citizen of the State of Texas.

18.    Plaintiff Carolyn Gipson is a citizen of the State of Texas.

- 4 -

19.     Plaintiff Alvin Richardson is a citizen of the State of Texas.

20.     Plaintiff Kelly Weatherspoon is a citizen of the State of Illinois.

21.     Plaintiff Haneef Haqq is a citizen of the State of Georgia.

22.     Plaintiffs Dawyn and Ronald Palmer are citizens of the State of North Carolina.

23.     Plaintiff William W. Powell, Jr. is a citizen of the State of Georgia.

24.     Plaintiff Elona Wagner is a citizen of the State of Florida.

25.     Plaintiff William Werking is a citizen of the State of Florida.

26.     Bank of America is a national bank which maintains its principal place of business in Charlotte, North Carolina.  Bank of America regularly and systematically conducts business throughout the State of Florida, including in this district.  Among other things, Bank of America is engaged in the business of providing retail banking services to millions of consumers, including Plaintiffs and members of the putative Classes, which include the issuance of debit cards for use by its customers in conjunction with their checking accounts.  Bank of America boasts the country's most extensive branch network, with more than 6,100 locations covering over 30 states and the District of Columbia.

27.     Bank of America is a national bank, subject to the National Bank Act, 12 U.S.C. § 1, *et seq.*, and regulations promulgated by the Office of the Comptroller of the Currency.

## CLASS ALLEGATIONS

28.     Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Fed. R. Civ. P. 23.  This action satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements of Rule 23.

29.     The proposed classes are defined as:

> All Bank of America customers in the United States (except for California) who, within the applicable statute of limitations preceding the filing of this action to the date of class certification, incurred an overdraft fee as a result of Bank of America's practice of re-sequencing debit card transactions from highest to lowest (the "National Class").

> All Bank of America customers having accounts at branches in the states of Connecticut, Illinois, Kansas, Massachusetts, Minnesota, Montana, New Jersey, New Mexico, New York, North Carolina, Ohio, Oregon, Washington, and Wisconsin for the purpose of asserting claims under their respective state consumer protection statutes (the "State Subclasses") (*see* Fifth Claim for Relief, *infra*).

> The National Class and the State Subclasses are collectively referred to as the "Classes."

30.     Plaintiffs reserve the right to modify or amend the definition of the proposed Classes before the Court determines whether certification is appropriate.

31.     Excluded from the Classes are Bank of America, its parents, subsidiaries, affiliates, officers and directors, any entity in which Bank of America has a controlling interest, all customers who make a timely election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

32.     The members of the Classes are so numerous that joinder is impractical. The Classes consist of thousands of members, the identity of whom is within the knowledge of and can be ascertained only by resort to Bank of America's records.

33.     The claims of the representative Plaintiffs are typical of the claims of the Classes in that the representative Plaintiffs, like all Class members, were charged overdraft fees by Bank of America as a result of its practice of re-sequencing debit card transactions from highest to lowest. The representative Plaintiffs, like all Class members, have been damaged by Bank of America's misconduct in that they incurred and/or will continue to incur unfair and unconscionable overdraft charges. Furthermore, the factual basis of Bank of America's

misconduct is common to all Class members, and represents a common thread of unfair and unconscionable conduct resulting in injury to all members of the Classes.

34.     There are numerous questions of law and fact common to the Classes and those common questions predominate over any questions affecting only individual Class members.

35.     Among the questions of law and fact common to the Classes are whether Bank of America:

a.     Does not clearly disclose and/or refuses to allow its customers to opt out of its overdraft protection program;

b.     Does not obtain affirmative consent from its customers prior to processing transactions that will result in overdraft fees;

c.     Does not alert its customers that a debit card transaction will trigger an overdraft fee, and does not provide its customers with an opportunity to cancel such transactions;

d.     Manipulates and reorders transactions so that it can increase the number of overdraft fees it imposes;

e.     Manipulates and reorders debits from highest to lowest in order to maximize the number of overdrafts and, consequently, the amount of overdraft fees;

f.     Imposes overdrafts and overdraft fees when, but for reordering transactions, there would otherwise be sufficient funds in the account;

g.     Fails to provide customers with accurate balance information;

h.     Delays posting of transactions by customers using debit cards so that customers are charged overdraft fees on transactions, even though the customers had sufficient funds in their accounts to cover the transactions upon execution;

     i.     Charges exorbitant overdraft fees that bear no relationship to the actual costs and risks of covering insufficient funds transactions;

     j.     Breaches its covenant of good faith and fair dealing with Plaintiffs and the other members of the Classes through its overdraft policies and practices;

     k.     Converts moneys belonging to Plaintiffs and the other members of the Classes through its overdraft policies and practices;

     l.     Requires its customers to enter into standardized account agreements which include unconscionable provisions;

     m.     Is unjustly enriched through its overdraft policies and practices;

     n.     Violates the consumer protection acts of certain states through its overdraft policies and practices; and

     o.     Continues to commit wrongdoing through its overdraft policies and practices.

36.     Other questions of law and fact common to the Classes include:

     a.     The proper method or methods by which to measure damages, and

     b.     The injunctive relief to which the Classes are entitled.

37.     Plaintiffs' claims are typical of the claims of other Class members, in that they arise out of the same wrongful overdraft policies and practices and the same or substantially similar unconscionable provisions of Bank of America's account agreements and other related documents. Plaintiffs have suffered the harm alleged and have no interests antagonistic to the interests of any other Class member.

38.     Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel experienced in the prosecution of class actions and, in particular,

class actions on behalf of consumers and against financial institutions. Accordingly, Plaintiffs are adequate representatives and will fairly and adequately protect the interests of the Classes.

39.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the amount of each individual Class member's claim is small relative to the complexity of the litigation, and due to the financial resources of Bank of America, no Class member could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, the Class members will continue to suffer losses and Bank of America's misconduct will proceed without remedy.

40.     Even if Class members themselves could afford such individual litigation, the court system could not. Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court.

## COMMON FACTUAL ALLEGATIONS

### A.     Bank of America

41.     According to its website, Bank of America is one of this country's largest consumer banking companies, with more than 59 million consumer and small business relationships, over 6,100 retail banking offices, in excess of 18,000 ATMs, and online banking with nearly 24 million active users covering more than 30 states and the District of Columbia.

42.     Bank of America is in the business of providing its customers with a variety of banking services. One of the services provided by Bank of America for customers who open a

checking account is a debit card, also known as a check card or ATM card. Through those debit cards, customers can engage in transactions using funds directly from their accounts by engaging in "debit" or "point of sale" ("POS") transactions, or may withdraw money from their accounts at automated teller machines ("ATMs"). Whether the card is used to execute POS transactions or to withdraw cash from ATM machines, the transaction is processed electronically. As a result, Bank of America is notified instantaneously when the card is swiped, and has the option to accept or decline transactions at such time.

43.    Bank of America employs sophisticated software to automate its overdraft system. This program maximizes the number of overdrafts, and thus, the amount of overdraft fees charged per customer.

44.    As a result of Bank of America's manipulation and alteration of customers' transactions records, funds in a customer's account are depleted more rapidly and more overdraft fees are likely to be charged for multiple smaller transactions. Indeed, overdraft charges are likely to occur at times when, but for the manipulation and alteration, there would be funds in the account and no overdraft would occur. For example, if a customer, whose account has a $50 balance at the time Bank of America processed several transactions, made four transactions of $10 and one subsequent transaction of $100 on the same day, the Bank would reorder the debits from largest to smallest, imposing four overdraft fees on the customer. Conversely, if the $100 transaction were debited last—consistent with the actual order of transactions—only one overdraft fee would be assessed. *See* FDIC Study of Bank Overdraft Programs, November 2008, *available at*: http://www.fdic.gov/bank/analytical/overdraft/, at 11, n. 12.

**B.     Bank of America's Relevant Customer Documents Regarding Overdrafts**

45.    Plaintiffs and all members of the Classes maintain or maintained a checking account with Bank of America. The terms of Bank of America's checking accounts are

contained in standardized account holder agreements, presented to its customers on a "take it or leave it" basis, drafted and imposed by Bank of America, which was the party of vastly superior bargaining strength, and thus constitute agreements of adhesion. A representative copy of the "Deposit Agreement and Disclosures" (the "Deposit Agreement"), covering customers maintaining accounts in 27 states and the District of Columbia, which is over 40 pages long, single-spaced and in small font, is attached as Exhibit A.

46.    The Deposit Agreement states that "[i]n *most* states we process and post items within each category from highest to lowest dollar amount" (p. 18, emphasis added). It further states that the "high-to-low posting order *may* result in more insufficient funds items and more fees" even though it *will almost always* result in more fees. *Id.* (emphasis added); *see also* pp. 20-21.

47.    The Deposit Agreement also states that Bank of America "may charge you a fee for each insufficient funds item whether we pay, permit, return, decline or reject the item." *Id.* at 20.

48.    Bank of America also publishes a pamphlet that is available to customers at its branches entitled a "Personal Schedule of Fees" (the "Fee Schedule"). Substantially similar Fee Schedules are available for customers in each state in which the Bank conducts business. A representative copy of the Fee Schedule is attached as Exhibit B. The Fee Schedule provides "Overdraft Item Fee and NSF:  Returned Item Fee – For the first day your account has an occurrence, fee for each overdraft item and for each returned item" is "25.00 each item" effective April 18, 2008. Fee Schedule, p. 9. The Fee Schedule further provides:  "For the second and subsequent days your account has an occurrence, fee for each overdraft item and for each

returned" is "35.00 each item." An "occurrence" is defined as "a day with at least one overdraft item or one returned item." *Id.*

49.     The Bank also publishes "Important Information About Your Card Agreement and Disclosure" (the "Card Agreement"), a representative copy of which is attached as Exhibit C. The Card Agreement "supplements the Deposit Agreement and the related Fee Schedule (collectively, the 'Deposit Agreement') that apply to each Bank of America deposit account that you link to your card." Card Agreement, p. 1.

50.     The Deposit Agreement and related documents, including the Fee Schedule and Card Agreement, fail to disclose to customers that they have the option to "opt out" from the Bank's overdraft scheme, although it is possible for them to opt out upon request.

**C.     Bank of America's Re-Ordering of Checking Account Transactions**

51.     In an effort to maximize overdraft revenue, Bank of America manipulates and reorders debits from highest to lowest during given periods of time. Bank of America reorders transactions for no reason other than to increase the number of exorbitant overdraft fees it can charge. This practice violates numerous consumer protection laws and the covenant of good faith and fair dealing in the Bank's Deposit Agreement.

52.     In addition, Bank of America misleads its customers regarding its reordering practices. Instead of unequivocally telling its customers that it will reorder debits from highest to lowest, the Bank states in its contract that "[w]e *may* determine in our discretion the order of processing and posting deposits, fees, charges, checks, debits and other items to your account. We *may* credit, accept, pay, certify or return deposits, fees, charges, checks, debits and other items arriving to your account on the *same day* in any order at our option." This statement is deceptive and/or unfair because it is, in fact, the Bank's practice to *always* reorder debits from highest to lowest, and because the Bank groups together POS transactions that occurred on

- 12 -

subsequent days with POS transactions that occurred on earlier days, and reorders them so that higher debits that occurred on subsequent days are posted to its customers' accounts before lower debits that occurred on earlier days, contrary to the terms of the Bank Deposit Agreement and its customers' reasonable expectations. The Bank's practices thus violate the covenant of good faith and fair dealing implied in the Bank Deposit Agreement as well as the consumer protection laws of numerous states.

53.     Transactions involving debit cards used by Bank of America customers, including the withdrawal of cash from ATM machines and POS transactions with vendors, are processed electronically. As a result, Bank of America is notified instantaneously when the customer's debit card is swiped, and has the option to accept or decline these transactions.

54.     Notwithstanding the instantaneous nature of these electronic debit card transactions, under Bank of America's posting system, it fails to post charges in the order in which they are incurred or received. Bank of America developed a policy and employs a practice whereby account charges and debits are posted to its customers' accounts out of chronological order for the sole purpose of maximizing the number of overdraft transactions and, therefore, the amount of overdraft fees charged to its customers.

55.     Instead of processing such transactions in chronological order, Bank of America processes them starting with the largest debit and ending with the smallest debit, so as to generate the largest possible number of overdrafts and the greatest possible amount of overdraft fees.

56.     Bank of America refrains from immediately posting charges to a customer's account as it receives them—sometimes for multiple business days. By holding charges rather than posting them immediately to an account, Bank of America is able to amass a number of

- 13 -

charges on the account.  Subsequently, Bank of America posts all of the amassed charges on a single date.  When the group of charges is eventually posted to the customer's account, Bank of America posts them in order of largest to smallest—not in the order in which they were received or in the order in which they were charged.  This delayed posting results in the imposition of multiple overdraft fees that would not otherwise be imposed.  The delayed posting also prevents customers from ascertaining the accurate balances in their accounts.

57.     Bank of America's policy and practice of posting charges from largest to smallest, rather than chronologically, or from smallest to largest, is specifically designed to maximize the generation of overdraft fees by triggering overdraft fees for account charges that would not otherwise result in such fees.

58.     Bank of America enforces an unconscionable policy whereby charges incurred are posted to customers' accounts in a non-chronological order, from highest to lowest, and are held for multiple days and then batched together, to maximize the number of overdraft transactions and fees.  Bank of America's processing practices substantially increase the likelihood that customers' smaller charges will result in multiple overdraft fees.  The practices provide Bank of America with substantially higher service fee revenues than it would otherwise achieve absent these practices.

59.     As a result, Plaintiffs and members of the Classes have been assessed overdraft fees for transactions which occurred when they actually had sufficient funds in their accounts to cover those transactions.

**D.     Bank of America's Cloaking of Accurate Balance Information**

60.     Bank of America actively promotes the convenience of its debit cards and other electronic debiting, but fails to provide customers with accurate balance information.  When

customers execute account transactions, they generally do not have access to an accurate balance register or balance information.

61.     Bank of America provides inaccurate balance information to its customers through its electronic network.  In certain cases, Bank of America informs its customers that they have a positive balance when, in reality, they have a negative balance, despite the Bank's actual knowledge of outstanding debits and transactions.

62.     Even when Bank of America has actual knowledge of outstanding transactions which have already created a negative balance in a customers' account, it encourages the customer to incur more overdraft charges by approving—rather than prudently declining—subsequent debit card purchases and other electronic transactions.

63.     Bank of America also assesses overdraft fees at times when actual funds in the customer account are sufficient to cover all debits that have been submitted to the Bank for payment.  It does this by placing a "hold" on actual funds in the customer's account.  In doing so, Bank of America charges overdraft fees where it faces no risk, because the cash balance in the customer's account has not dropped below zero.

### E.     Bank of America's Failure to Notify Customers of Overdrafts or Advise Customers of Their Right to Opt Out

64.     At the time its debit cards are used in POS transactions or at ATMs, Bank of America is able to determine, almost instantaneously, whether there are sufficient funds in a customer's account to cover that particular transaction.   The Bank has the technological capability to decline transactions (which it does when a pending transaction would exceed a pre-determined, overdraft tolerance limit for the account), or notify customers at that very moment that the particular debit card transaction would result in an overdraft.  Bank of America could give customers the option to decline the transaction to avoid incurring the overdraft fee, but it

does not do so because it seeks to maximize the amount of revenue generated through its assessment of overdraft fees.

65.     Notwithstanding its technological capabilities and actual knowledge, Bank of America fails to provide notice to Plaintiffs and the Classes that a particular debit card transaction will result in an overdraft and, hence, an overdraft fee.  Because Bank of America's customers are not notified of the potential overdraft, and are not given the option of declining the debit card transaction or providing another form of payment, the customers incur monetary damages in the form of overdraft fees.

66.     Bank of America fails to make Plaintiffs and Class members aware that they can opt out of its overdraft scheme upon request, thereby avoiding any overdraft fees from being incurred.

**F.     Bank of America's Overdraft Policies and Practices Are Contrary to Best Practices**

67.     By engaging in the conduct described herein, Bank of America has failed to follow the list of "best practices" for overdraft programs set forth in the "Joint Guidance on Overdraft Protection Programs" ("Joint Guidance") issued by the United States Department of the Treasury, the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, and the National Credit Union Administration (collectively, the "Agencies").  A copy of the Joint Guidance is attached as Exhibit D.  These "best practice" recommendations include: "Provide election or opt-out of service.  Obtain affirmative consent of consumers to receive overdraft protection.  Alternatively, where overdraft protection is automatically provided, permit consumers to 'opt-out' of the overdraft program and provide a clear consumer disclosure of this option."  70 F.R. 9127-01, 9132.

68.     According to rules proposed by the Agencies: "Injury [caused by overdraft charges] is not outweighed by countervailing benefits. . . . This is particularly the case for ATM withdrawals and POS debit card transactions where, but for the overdraft service, the transaction would typically be denied and the consumer would be given the opportunity to provide other forms of payment without incurring any fee." 73 F.R. 28904-01, 28929 (May 19, 2008).

69.     The Joint Guidance also advises banks to "[a]lert customers before a transaction triggers any fees. When consumers attempt to withdraw or transfer funds made available through an overdraft protection program, provide a specific consumer notice, where feasible, that completing the withdrawal may trigger the overdraft fees." 70 F.R.D. 9127, 9132. The Joint Guidance further advises that "[t]his notice should be presented in a manner that permits consumers to cancel the attempted withdrawal or transfer after receiving the notice." *Id.*

70.     Similarly, the list of "best practices" recommended in "Overdraft Protection: A Guide for Bankers," issued by the American Bankers Association, includes offering customers the option of "opting out" of any overdraft programs, and informing customers, before they access funds, that a particular point of sale or ATM transaction will cause them to incur an overdraft fee. A copy of "Overdraft Protection: A Guide for Bankers" is attached as Exhibit E.

71.     Bank of America's overdraft policies make it difficult for customers to avoid injury even if they carefully track the balance in their account. In fact, the Agencies have stated that "Injury" resulting from such policies, "is not reasonably avoidable" by the consumer. 73 F.R. 28904-01, 28929. "It appears that consumers cannot reasonably avoid this injury if they are automatically enrolled in an institution's overdraft service without having an opportunity to opt out. Although consumers can reduce the risk of overdrawing their accounts by carefully tracking their credits and debits, consumers often lack sufficient information about key aspects of

- 17 -

their account.  For example, a consumer cannot know with any degree of certainty when funds from a deposit or a credit for a returned purchase will be made available."

72.     On October 6, 2009, the Center for Responsible Lending issued a report entitled "Overdraft Explosion:  Bank Fees for Overdrafts Increase 35% in Two Years."  The report, attached hereto as Exhibit F, finds that it is now "standard procedure to automatically enroll checking account customers in their most expensive overdraft loan program."  The report finds that debit card transactions account for more overdraft fees than traditional checks or any other type of transaction, even though "debit card transactions and ATM withdrawals . . . could easily be denied for no fee."  The report also finds that overdraft fees increased 35 percent from 2006 to 2008, and that over 50 million Americans overdrew their accounts in a 12 month period, with 27 million accounts incurring five or more overdraft fees.

73.    A chart from the research company Moebs Services shows that, in every year since 1992, banks have gained increased revenues from overdraft fees:



**G.    Bank of America's Unconscionable Provisions and Policies**

74.    Bank of America's overdraft policies and practices are unconscionable in the following respects, among others:

a.    The Bank does not disclose or reasonably disclose to customers that they have the option to "opt out" of the Bank's overdraft scheme;

     b.     The Bank does not obtain affirmative consent from checking account customers prior to processing a transaction that will overdraw the account and result in an overdraft fee;

     c.     The Bank does not alert its customers that a debit card transaction will trigger an overdraft, and does not provide the customer the opportunity to cancel that transaction, before assessing an overdraft fee;

     d.     The Deposit Agreement and related documents, including the Fee Schedule and Card Agreement, are contracts of adhesion in that they are standardized forms, imposed and drafted by the Bank, which is a party of vastly superior bargaining strength, and only relegates to the customer the opportunity to adhere to them or reject the agreement in its entirety;

     e.     The amount of overdraft fees is disclosed in an ineffective, ambiguous, misleading, and unfair manner, since it is not contained in the Deposit Agreement, but rather in a different and separate document, the Fee Schedule, which is not signed by the depositor; and

     f.     The Deposit Agreement provided to customers is ineffective, ambiguous, deceptive, unfair, and misleading in that it does not unambiguously state that the Bank always reorders debits from high to low, even though Bank of America *always* reorders transactions in this way for customers in order to maximize overdrafts and overdraft fee revenues for the Bank.

75.     The Deposit Agreement also contains an arbitration clause and a class action waiver which states: "YOU AND WE ARE BOTH GIVING UP THE RIGHT TO TRIAL BY JURY," and "THIS SECTION PRECLUDES YOU AND US FROM PARTICIPATING IN OR BEING REPRESENTED IN ANY CLASS OR REPRESENTATIVE ACTION OR JOINING

OR CONSOLIDATING THE CLAIMS OF OTHER PERSONS (HEREINAFTER REFERRED TO AS THE 'CLASS ACTION WAIVER')." Deposit Agreement, p. 40.

76.     Bank of America recently announced that it would no longer enforce mandatory arbitration in its disputes with customers.  A copy of the announcement posted on the Bank's website is attached as Exhibit G.

77.     Should Bank of America contend that its recent announcement about no longer enforcing mandatory arbitration was not intended to apply to this action, the above cited provisions are nevertheless unconscionable because the Deposit Agreement and related documents, to the extent they are deemed contracts, are unenforceable contracts of adhesion and the arbitration provision itself is substantively unconscionable.

### H.     Recently Announced Changes in Bank of America's Overdraft Policies and Practices Do Not Offer Any Remedial Benefits to Customers

78.     On September 21, 2009, Bank of America announced plans to overhaul its overdraft policies on a going-forward basis.  Thus far the bank has refused to correct several of the unfair practices described herein, such as the reordering of debits to increase overdraft fees. In addition, the changes do nothing to remedy the past wrongs to Plaintiffs and the Classes. They do not retroactively reverse the charges wrongly debited from their accounts, nor do they prevent Bank of America from resuming its previous unfair and unconscionable methods of business in the future.

### I.     Bank of America's Overdraft Practices Harmed Plaintiffs

79.     Plaintiff Ralph Tornes is a current or former checking account customer of Bank of America.

80.     In connection with his account, the Bank issued a debit card to Mr. Tornes.  A debit card allows customers to access their checking account funds by using the card to execute a

transaction.   The charge is processed electronically, and the Bank has the option to accept or decline the transaction at the point of sale.

81.     Bank of America charged Mr. Tornes multiple overdraft fees.  For example, based on information and belief, Mr. Tornes was charged five overdraft fees on June 23, 2008, in the amount of $35.00 each, for a total of $170.00.  Based on information and belief, the overdraft fees were based on the following ordering of transactions:

### Balance Sheet per Bank of America Reordering Scheme
### (Debits Processed from Highest to Lowest)

| | | Debits | Fees | Balance |
|---|---|---|---|---|
| | Beginning Balance on 6/20/08: | | | $ 361.68 |
| **Date Posted** | **Debit Description** | | | |
| 6/23/08 | CheckCard 0620 Transit Lounge | 89.00 | | 272.68 |
| 6/23/08 | CheckCard 0621 Segafredo Zanett | 69.09 | | 203.59 |
| 6/23/08 | Bird Road Offi 06/21 | 63.00 | | 140.59 |
| 6/23/08 | CheckCard 0621 | 54.75 | | 85.84 |
| 6/23/08 | Publix 0621 | 42.19 | | 43.65 |
| 6/23/08 | Westar 06/21 | 25.00 | | 18.65 |
| 6/23/08 | Bk of America ATM 06/23 | 20.00 | | - 1.35 |
| 6/23/08 | CheckCard 0621 Chevron | 6.78 | | - 8.13 |
| 6/23/08 | CheckCard 0620 Burger King | 5.73 | | -13.86 |
| 6/23/08 | CheckCard 0620 Diana's Café | 5.55 | | -19.41 |
| 6/23/08 | Westar 06/22 | 5.02 | | -24.43 |
| 6/23/08 | Bird Road Offi 6/21 | 2.00 | | -26.43 |
| 6/23/08 | Overdraft Item Fee | | 35.00 | |
| 6/23/08 | Overdraft Item Fee | | 35.00 | |
| 6/23/08 | Overdraft Item Fee | | 35.00 | |
| 6/23/08 | Overdraft Item Fee | | 35.00 | |
| 6/23/08 | Overdraft Item Fee | | 35.00 | |
| | | **Total Fees:** | **$ 175.00** | |

82.     If Bank of America had not manipulated and reordered Mr. Tornes transactions from highest to lowest, he would not have incurred five overdraft fees.

83.     For instance, if Bank of America had posted the transactions from lowest to highest, Mr. Tornes would have incurred only one overdraft fee instead of five:

### Balance Sheet if Debits Were Processed from Lowest to Highest

| Date Posted | Debit Description | Debits | Fees | Balance |
|---|---|---|---|---|
| | Beginning Balance on 6/20/08: | | | $ 361.68 |
| 6/23/08 | Bird Road Office 6/21 | 2.00 | | 359.68 |
| 6/23/08 | Weststar 06/22 | 5.02 | | 354.66 |
| 6/23/08 | CheckCard 0620 Diana's Café | 5.55 | | 349.11 |
| 6/23/08 | CheckCard 0620 Burger King | 5.73 | | 343.38 |
| 6/23/08 | CheckCard 0621 Chevron | 6.78 | | 336.60 |
| 6/23/08 | Bk of America ATM 06/23 | 20.00 | | 316.60 |
| 6/23/08 | Weststar 06/21 | 25.00 | | 291.60 |
| 6/23/08 | Publix 06/21 | 42.19 | | 249.41 |
| 6/23/08 | CheckCard 06/21 | 54.75 | | 194.66 |
| 6/23/08 | Bird Road Offi 6/21 | 63.00 | | 131.66 |
| 6/23/08 | CheckCard 0621 Segafredo Zanetti | 69.09 | | 62.57 |
| 6/23/08 | Checkcard 0620 Transit Lounge | 89.00 | | - 26.43 |
| 6/24/08 | Overdraft Item Fee for Activity of 06-23 | | 35.00 | |
| | | Total Fees: | $ 35.00 | |

84.     Likewise, if Bank of America had posted the transactions in chronological order,

Mr. Tornes would have incurred only three overdraft fees instead of five:

### Balance Sheet if Debits Were Processed in Chronological Order[2]

| Date of Transaction | Debit Description | Debits | Fees | Balance |
|---|---|---|---|---|
| | Beginning Balance on 6/20/08: | | | $ 361.68 |
| 6/20/08 | CheckCard 0620 Diana's Café | 5.55 | | 356.13 |
| 6/20/08 | CheckCard 0620 Burger King | 5.73 | | 35.04 |
| 6/20/08 | CheckCard 0620 Transit Lounge | 89.00 | | 261.40 |
| 6/21/08 | CheckCard 0621 Chevron | 6.78 | | 254.62 |
| 6/21/08 | Weststar 06/21 | 25.00 | | 229.62 |
| 6/21/08 | Publix 0621 | 42.19 | | 187.43 |
| 6/21/08 | CheckCard 0621 | 54.75 | | 132.68 |
| 6/21/08 | Bird Road Offi 06/21 | 2.00 | | 130.68 |
| 6/21/08 | Bird Road Offi 06/21 | 63.00 | | 67.68 |
| 6/21/08 | CheckCard 0621 Segafredo Zanett | 69.09 | | - 1.41 |
| 6/22/08 | Westar 06/22 | 5.02 | | - 6.43 |
| 6/23/08 | Bk of America ATM 06/23 | 20.00 | | - 26.43 |
| 6/24/08 | Overdraft Fee Item for Activity of 06-21 | | 35.00 | |
| 6/24/08 | Overdraft Fee Item for Activity of 06-21 | | 35.00 | |
| 6/24/08 | Overdraft Fee Item for Activity of 06-21 | | 35.00 | |
| | | | Total Fees: | $ 105.00 | |

85.     Plaintiff Jonathan Bylin is a current checking account customer of Bank of

America.

86.     In connection with his account, the Bank issued a debit card to Mr. Bylin.

---

[2] For each chart that lists the transactions in chronological order, the transactions are shown as listed in the Bank's statements, re-sorted only by date.  Because the statements do not indicate the hour and minute of each transaction, Plaintiffs have listed the transactions for each particular day in the same order in which they are listed in the statements, sorting only from earlier dates to later dates.  Thus, if the Bank's statements list transactions that occurred on one particular day in some order other than chronological—sorting from highest to lowest transaction, for example— Plaintiffs have not changed that order.  As a result, the chronological charts in this Complaint may reflect even more overdraft fees than Plaintiffs would have incurred had the Bank posted the transactions in strict chronological order.

87.     Bank of America charged Mr. Bylin multiple overdraft fees.  For example, based on information and belief, Mr. Bylin was charged five overdraft fees on March 31, 2009, in the amount of $25.00 each, for a total of $125.00.  Based on information and belief, the overdraft fees were based on the following ordering of transactions:

**Balance Sheet per Bank of America Reordering Scheme**
**(Debits Processed from Highest to Lowest)**

| | | Debits | Fees | Balance |
|---|---|---|---|---|
| | Beginning Balance on 3/30/09: | | | $7,286.33 |
| Date Posted | Debit Description | | | |
| 3/30/09 | Investors Savings Bank Bill Payment | 6,594.29 | | 692.04 |
| 3/30/09 | American Express Bill Payment | 2,432.14 | | -1,740.10 |
| 3/30/09 | Bk of America ATM 03/28 Withdrwl | 200.00 | | -1,940.10 |
| 3/30/09 | Bk of America ATM 03/28 Withdrwl | 200.00 | | -2,140.10 |
| 3/30/09 | Sou The Sports 03/29 | 126.22 | | -2,266.32 |
| 3/30/09 | CheckCard 0327 Peter J. Haigney, DC | 65.00 | | -2,331.32 |
| 3/30/09 | CheckCard 0327 Alexis Diner | 22.15 | | -2,353.47 |
| 3/30/09 | CheckCard 0327 American Royal Hardwr | 14.72 | | -2,368.19 |
| 3/30/09 | Quick Chek Foo 03/27 | 11.58 | | -2,379.77 |
| 3/31/09 | Overdraft Fee - Activity of 03/30 | | 25.00 | |
| 3/31/09 | Overdraft Fee - Activity of 03/30 | | 25.00 | |
| 3/31/09 | Overdraft Fee - Activity of 03/30 | | 25.00 | |
| 3/31/09 | Overdraft Fee - Activity of 03/30 | | 25.00 | |
| 3/31/09 | Overdraft Fee - Activity of 03/30 | | 25.00 | |
| | | Total Fees: | $125.00 | |

88.     If Bank of America had not manipulated and reordered Mr. Bylin's transactions from highest to lowest, he would not have incurred five overdraft fees.

89.     For instance, if Bank of America had posted the transactions from lowest to highest, Mr. Bylin would have incurred only one overdraft fee instead of five:

### Balance Sheet if Debits Were Processed from Lowest to Highest

| | | Debits | Fees | Balance |
|---|---|---|---|---|
| | Beginning Balance on 3/30/09: | | | $7,286.33 |
| Date Posted | Debit Description | | | |
| 3/30/09 | Quick Chek Foo 03/27 | 11.58 | | 7,274.75 |
| 3/30/09 | CheckCard 0327 American Royal Hardwr | 14.72 | | 7,260.03 |
| 3/30/09 | CheckCard 0327 Alexis Diner | 22.15 | | 7,237.88 |
| 3/30/09 | CheckCard 0327 Peter J. Haigney, DC | 65.00 | | 7,172.88 |
| 3/30/09 | Sou The Sports 03/29 | 126.22 | | 7,046.66 |
| 3/30/09 | Bk of America ATM 03/28 Withdrwl | 200.00 | | 6,846.66 |
| 3/30/09 | Bk of America ATM 03/28 Withdrwl | 200.00 | | 6,646.66 |
| 3/30/09 | American Express Bill Payment | 2,432.14 | | 4,214.52 |
| 3/30/09 | Investors Savings Bank Bill Payment | 6,594.29 | | -2,379.77 |
| 3/31/09 | Overdraft Fee – Activity of 03/30 | | 25.00 | |
| | | | Total Fees: | $25.00 |

90.     Likewise, if Bank of America had posted the transactions in chronological order, Mr. Bylin would have incurred only one overdraft fee instead of five:

### Balance Sheet if Debits Were Processed in Chronological Order

| | | Debits | Fees | Balance |
|---|---|---|---|---|
| | Beginning Balance on 3/30/09: | | | $7,286.33 |
| Date of Transaction | Debit Description | | | |
| 3/27/09 | Quick Chek Foo 03/27 | 11.58 | | 7,274.75 |
| 3/27/09 | CheckCard 0327 American Royal Hardwr | 14.72 | | 7,260.03 |
| 3/27/09 | CheckCard 0327 Alexis Diner | 22.15 | | 7,237.88 |
| 3/27/09 | CheckCard 0327 Peter J. Haigney, DC | 65.00 | | 7,172.88 |
| 3/28/09 | Bk of America ATM 03/28 Withdrwl | 200.00 | | 6,972.88 |
| 3/28/09 | Bk of America ATM 03/28 Withdrwl | 200.00 | | 6,772.88 |
| 3/29/09 | Sou The Sports 03/29 | 126.22 | | 6,646.66 |
| 3/30/09 | American Express Bill Payment | 2,432.14 | | 4,214.52 |
| 3/30/09 | Investors Savings Bank Bill Payment | 6,594.29 | | -2,379.77 |
| 3/31/09 | Overdraft Item Fee | | 25.00 | |
| | | | Total Fees: | $ 25.00 |

91.     Plaintiff Joshua Di Frances is a former checking account customer of Bank of America.

92.     In connection with his account, the Bank issued a debit card to Mr. Di Frances.

93.     Bank of America charged Mr. Di Frances multiple overdraft fees.  For example, based on information and belief, Mr. Di Frances was charged four overdraft fees on July 17, 2009, in the amount of $35.00 each, for a total of $140.00.  Based on information and belief, the overdraft fees were based on the following ordering of transactions:

**Balance Sheet per Bank of America Reordering Scheme**
**(Debits Processed from Highest to Lowest)**

| | | Debits | Fees | Balance |
|---|---|---|---|---|
| | Beginning Balance on 7/15/09: | | | $ 87.19 |
| Date Posted | Debit Description | | | |
| 7/16/09 | Check 1026 | 300.00 | | -212.81 |
| 7/16/09 | CheckCard 0715 Star Market | 20.69 | | -233.50 |
| 7/16/09 | CheckCard 0715 Sebastians | 10.92 | | -244.42 |
| 7/16/09 | CheckCard 0714 Dunkin | 2.29 | | -246.71 |
| 7/17/09 | Overdraft Fee – Activity of 07- | | 35.00 | |
| 7/17/09 | Overdraft Fee – Activity of 07- | | 35.00 | |
| 7/17/09 | Overdraft Fee – Activity of 07- | | 35.00 | |
| 7/17/09 | Overdraft Fee – Activity of 07- | | 35.00 | |
| | | Total Fees: | $140.00 | |

94.     If Bank of America had not manipulated and reordered Mr. Di Frances's transactions from highest to lowest, he would not have incurred four overdraft fees.

95.    For instance, if Bank of America had posted the transactions from lowest to highest, Mr. Di Frances would have incurred only one overdraft fee instead of four:

### Balance Sheet if Debits Were Processed from Lowest to Highest

|  |  | Debits | Fees | Balance |
|---|---|---|---|---|
|  | **Beginning Balance on 07/15/09:** |  |  | **$ 87.19** |
| **Date Posted** | **Debit Description** |  |  |  |
| 7/16/09 | CheckCard 0714 Dunkin | 2.29 |  | 84.90 |
| 7/16/09 | CheckCard 0715 Sebastians | 10.92 |  | 73.98 |
| 7/16/09 | CheckCard 0715 Star Market | 20.69 |  | 53.29 |
| 7/16/09 | Check 1026 | 300.00 |  | - 246.71 |
| 7/16/09 | Overdraft Fee – Activity of 07-16 |  | 35.00 |  |
|  |  | **Total Fees:** | **$ 35.00** |  |

96.    Likewise, if Bank of America had posted the transactions in chronological order, Mr. Di Frances would have incurred only one overdraft fee instead of four:

### Balance Sheet if Debits Were Processed in Chronological Order

|  |  | Debits | Fees | Balance |
|---|---|---|---|---|
|  | **Beginning Balance on 07/15/09:** |  |  | **$ 87.19** |
| **Date Posted** | **Debit Description** |  |  |  |
| 7/16/09 | CheckCard 0714 Dunkin | 2.29 |  | 84.90 |
| 7/16/09 | CheckCard 0715 Sebastians | 10.92 |  | 73.98 |
| 7/16/09 | CheckCard 0715 Star Market | 20.69 |  | 53.29 |
| 7/16/09 | Check 1026 | 300.00 |  | - 246.71 |
| 7/16/09 | Overdraft Fee – Activity of 07-16 |  | 35.00 |  |
|  |  | **Total Fees:** | **$ 35.00** |  |

97.    Plaintiff David Hanny is a current checking account customer of Bank of America.

98.    In connection with his account, the Bank issued a debit card to Mr. Hanny.

99.     Bank of America charged Mr. Hanny multiple overdraft fees.  For example, based on information and belief, Mr. Hanny was charged four overdraft fees on June 17, 2008, in the amount of $25.00 each, for a total of $100.00.  Based on information and belief, the overdraft fees were based on the following ordering of transactions:

### Balance Sheet per Bank of America Reordering Scheme
### (Debits Processed from Highest to Lowest)

| | | Debits | Fees | Balance |
|---|---|---|---|---|
| | Beginning Balance on 6/13/08: | | | $498.41 |
| Date Posted | Debit Description | | | |
| 6/16/08 | Costco Whse #0 06/16 | 143.92 | | 354.49 |
| 6/16/08 | Check #6107 | 138.00 | | 216.49 |
| 6/16/08 | CheckCard 0617 Price Chopr | 69.46 | | 147.03 |
| 6/16/08 | Wal-Mart #0577 06/15 | 50.36 | | 96.67 |
| 6/16/08 | Costco Gas #00 06/16 | 28.02 | | 68.65 |
| 6/16/08 | Hen House #31 06/16 | 24.61 | | 44.04 |
| 6/16/08 | CheckCard 0614 Great Mall | 21.26 | | 22.78 |
| 6/16/08 | CheckCard 0614 Great Mall | 18.50 | | 4.28 |
| 6/16/08 | CheckCard 0613 Qt 212 | 11.58 | | - 7.30 |
| 6/16/08 | Sou Guitar Cen 06/14 | 10.70 | | -18.00 |
| 6/16/08 | Keep the Change Transfer Canceled-Low Acct Balance | | | -18.00 |
| 6/17/08 | Overdraft Fee – Activity of 06/16 | | 25.00 | |
| 6/17/08 | Overdraft Fee – Activity of 06/16 | | 25.00 | |
| 6/17/08 | Overdraft Fee – Activity of 06/16 | | 25.00 | |
| 6/17/08 | Overdraft Fee – Activity of 06/16 | | 25.00 | |
| | | Total Fees: | $100.00 | |

100.    If Bank of America had not manipulated and reordered Mr. Hanny's transactions from highest to lowest, he would not have incurred four overdraft fees.

101.    For instance, if Bank of America had posted the transactions from lowest to highest, Mr. Hanny would have incurred only one overdraft fee instead of four:

### Balance Sheet if Debits Were Processed from Lowest to Highest

| | | Debits | Fees | Balance |
|---|---|---|---|---|
| | Beginning Balance on 06/13/08: | | | $498.41 |
| Date Posted | Debit Description | | | |
| 6/16/08 | Sou Guitar Cen 06/14 | 10.70 | | 487.71 |
| 6/16/08 | CheckCard 0613 Qt 212 | 11.58 | | 476.13 |
| 6/16/08 | CheckCard 0614 Great Mall | 18.50 | | 457.63 |
| 6/16/08 | CheckCard 0614 Great Mall | 21.26 | | 436.37 |
| 6/16/08 | Hen House #31 06/16 | 24.61 | | 411.76 |
| 6/16/08 | Costco Gas #00 06/16 | 28.02 | | 383.74 |
| 6/16/08 | Wal-Mart #0577 06/15 | 50.36 | | 333.38 |
| 6/16/08 | CheckCard 0613 | 69.46 | | 263.92 |
| 6/16/08 | Check 6107 | 138.00 | | 125.92 |
| 6/16/08 | Costco Whse #0 06/16 | 143.92 | | -18.00 |
| 6/17/08 | Overdraft Fee | | 25.00 | |
| | | Total Fees: | $25.00 | |

102.    Likewise, if Bank of America had posted the transactions in chronological order, Mr. Hanny would have incurred only one overdraft fee instead of four:

### Balance Sheet if Debits Were Processed in Chronological Order

| | | Debits | Fees | Balance |
|---|---|---|---|---|
| | Beginning Balance on 6/13/08: | | | $498.41 |
| Date of Transaction | Debit Description | | | |
| 6/13/08 | CheckCard 0613 Price Chopr | 69.46 | | 428.95 |
| 6/13/08 | CheckCard 0613 Qt 212 | 11.58 | | 417.37 |
| 6/14/08 | CheckCard 0614 Great Mall | 21.26 | | 396.11 |
| 6/14/08 | CheckCard 0614 Great Mall | 18.50 | | 377.61 |
| 6/14/08 | Sou Guitar Center 0614 | 10.70 | | 366.91 |
| 6/15/08 | Wal-Mart #0577 06/15 | 50.36 | | 316.55 |
| 6/16/08 | Costco Whse #0616 | 143.92 | | 172.63 |
| 6/16/08 | Check 6107 | 138.00 | | 34.63 |
| 6/16/08 | Costco Gas #00 06/16 | 28.02 | | 6.61 |
| 6/16/08 | Hen House #31 06/16 | 24.61 | | -18.00 |
| 6/17/08 | Overdraft Fee | | 25.00 | |
| | | Total Fees: | $25.00 | |

- 30 -

103.    Plaintiffs Esther and Stephen James are current or former checking account customers of Bank of America; they maintain or maintained a joint account.

104.    In connection with their account, the Jameses were issued a debit card by the Bank.

105.    Bank of America charged the Jameses multiple overdraft fees.  For example, based on information and belief, the Jameses were charged three overdraft fees on July 28, 2008, in the amount of $35.00 each, for a total of $105.00.  Based on information and belief, the overdraft fees were based on the following ordering of transactions:

### Balance Sheet per Bank of America Reordering Scheme
### (Debits Processed from Highest to Lowest)

|  |  | Debits | Fees | Balance |
|---|---|---|---|---|
|  | **Beginning Balance on 7/25/08:** |  |  | **$ 150.44** |
| **Date Posted** | **Debit Description** |  |  |  |
| 7/28/08 | Online Banking transfer from Chk **$40.00** |  |  | 190.44 |
| 7/28/08 | Online Banking transfer from Sav **$20.47** |  |  | 210.91 |
| 7/28/08 | CheckCard 0727 Wal-Mart | 115.79 |  | 95.12 |
| 7/28/08 | Txu Energy | 37.83 |  | 57.29 |
| 7/28/08 | CheckCard 0725 Walgreen | 37.19 |  | 20.10 |
| 7/28/08 | Prepaid Legal | 17.00 |  | 3.10 |
| 7/28/08 | CheckCard 0725 Walgreens | 16.11 |  | - 13.01 |
| 7/28/08 | Prepaid Legal | 9.95 |  | - 22.96 |
| 7/28/08 | CheckCard 0724 Wendy's | 4.29 |  | - 27.25 |
| 7/28/08 | Overdraft Item Fee – Activity of 7/28 |  | 35.00 |  |
| 7/28/08 | Overdraft Item Fee – Activity of 7/28 |  | 35.00 |  |
| 7/28/08 | Overdraft Item Fee – Activity of 7/28 |  | 35.00 |  |
|  |  | **Total Fees:** | **$105.00** |  |

106.    If Bank of America had not manipulated and reordered the James's transactions from highest to lowest, they would not have incurred three overdraft fees.

107. For instance, if Bank of America had posted the transactions from lowest to highest, the Jameses would have incurred only one overdraft fee instead of three:

**Balance Sheet if Debits Were Processed from Lowest to Highest**

| | | Debits | Fees | Balance |
|---|---|---|---|---|
| | Beginning Balance on 7/25/08: | | | $ 150.44 |
| Date Posted | Debit Description | | | |
| 7/28/08 | Online Banking transfer from Chk **$40.00** | | | 190.44 |
| 7/28/08 | Online Banking transfer from Sav **$20.47** | | | 210.91 |
| 7/28/08 | CheckCard 0724 Wendy's | 4.29 | | 206.62 |
| 7/28/08 | Prepaid Legal | 9.95 | | 196.67 |
| 7/28/08 | CheckCard 0725 Walgreens | 16.11 | | 180.56 |
| 7/28/08 | Prepaid Legal | 17.00 | | 163.56 |
| 7/28/08 | CheckCard 0725 Walgreen | 37.19 | | 126.37 |
| 7/28/08 | Txu Energy | 37.83 | | 88.54 |
| 7/28/08 | CheckCard 0727 Wal-Mart | 115.79 | | - 27.25 |
| 7/28/08 | Overdraft Item Fee – Activity of 7/28 | | 35.00 | |
| | | Total Fees: | $ 35.00 | |

108. Likewise, if Bank of America had posted the transactions in chronological order, the Jameses would have incurred only one overdraft fee instead of three:

**Balance Sheet if Debits Were Processed in Chronological Order**

| | | Debits | Fees | Balance |
|---|---|---|---|---|
| | Beginning Balance on 7/25/08: | | | $ 150.44 |
| Date of Transaction | Debit Description | | | |
| 7/28/08 | Online Banking transfer from Chk **$40.00** | | | 190.44 |
| 7/28/08 | Online Banking transfer from Sav **$20.47** | | | 210.91 |
| 7/24/08 | CheckCard 0724 Wendy's | 4.29 | | 206.62 |
| 7/25/08 | CheckCard 0725 Walgreens | 16.11 | | 190.51 |
| 7/25/08 | CheckCard 0725 Walgreen | 37.19 | | 153.32 |
| 7/27/08 | CheckCard 0727 Wal-Mart | 115.79 | | 37.53 |
| 7/28/08 | Prepaid Legal | 9.95 | | 27.58 |
| 7/28/08 | Prepaid Legal | 17.00 | | 10.58 |
| 7/28/08 | Txu Energy | 37.83 | | - 27.25 |
| 7/28/08 | Overdraft Item Fee – Activity of 7/28 | | 35.00 | |
| | | Total Fees: | $ 35.00 | |

109.    Plaintiff Nelson Norman is a former checking account customer of Bank of America.

110.    In connection with his account, the Bank issued a debit card to Mr. Norman.

111.    Bank of America charged Mr. Norman multiple overdraft fees.  For example, based on information and belief, Mr. Norman was charged five overdraft fees on October 15, 2008, in the amount of $35.00 each, for a total of $175.00.  Based on information and belief, the overdraft fees were based on the following ordering of transactions:

**Balance Sheet per Bank of America Reordering Scheme**
**(Debits Processed from Highest to Lowest)**

| Date Posted | Debit Description | Debits | Fees | Balance |
|---|---|---|---|---|
| | **Beginning Balance on 10/14/08:** | | | **$ 272.80** |
| 10/14/08 | Hsbc Credit | 300.00 | | - 27.20 |
| 10/14/08 | Bk of America ATM 10/13 | 100.00 | | - 127.20 |
| 10/14/08 | Bk of America ATM 10/12 | 60.00 | | - 187.20 |
| 10/14/08 | Bk of America ATM 10/13 | 60.00 | | - 247.20 |
| 10/14/08 | BK of America ATM 10/13 | 40.00 | | - 287.20 |
| 10/15/08 | Overdraft Fee – Activity of 10/14 | | 35.00 | |
| 10/15/08 | Overdraft Fee – Activity of 10/14 | | 35.00 | |
| 10/15/08 | Overdraft Fee - Activity of 10/14 | | 35.00 | |
| 10/15/08 | Overdraft Fee - Activity of 10/14 | | 35.00 | |
| 10/15/08 | Overdraft Fee - Activity of 10/14 | | 35.00 | |
| | | **Total Fees:** | **$175.00** | |

112.    If Bank of America had not manipulated and reordered Mr. Norman's transactions from highest to lowest, he would not have incurred five overdraft fees.

113.   For instance, if Bank of America had posted the transactions from lowest to highest, Mr. Norman would have incurred only one overdraft fee instead of five:

**Balance Sheet if Debits Were Processed from Lowest to Highest**

| | | Debits | Fees | Balance |
|---|---|---|---|---|
| | **Beginning Balance on 10/14/08:** | | | **$ 272.80** |
| **Date Posted** | **Debit Description** | | | |
| 10/14/08 | BK of America ATM 10/13 | 40.00 | | 232.80 |
| 10/14/08 | Bk of America ATM 10/13 | 60.00 | | 172.80 |
| 10/14/08 | Bk of America ATM 10/12 | 60.00 | | 112.80 |
| 10/14/08 | Bk of America ATM 10/13 | 100.00 | | 12.80 |
| 10/14/08 | Hsbc Credit | 300.00 | | - 287.20 |
| 10/15/08 | Overdraft Fee | | 35.00 | |
| | | | **Total Fees:** | **$ 35.00** |

114.   Likewise, if Bank of America had posted the transactions in chronological order, Mr. Norman would have incurred only one overdraft fee instead of five:

**Balance Sheet if Debits Were Processed in Chronological Order**

| | | Debits | Fees | Balance |
|---|---|---|---|---|
| | **Beginning Balance on 10/14/08:** | | | **$ 272.80** |
| **Date of Transaction** | **Debit Description** | | | |
| 10/12/08 | Bk of America ATM 10/12 | 60.00 | | 212.80 |
| 10/13/08 | BK of America ATM 10/13 | 40.00 | | 172.80 |
| 10/13/08 | Bk of America ATM 10/13 | 60.00 | | 112.80 |
| 10/13/08 | Bk of America ATM 10/13 | 100.00 | | 12.80 |
| 10/14/08 | Hsbc Credit | 300.00 | | - 287.20 |
| 10/15/08 | Overdraft Fee | | 35.00 | |
| | | | **Total Fees:** | **$ 35.00** |

115.   Plaintiff Carolyn Gipson is a current or former checking account customer of Bank of America.

116.   In connection with her account, the Bank issued a debit card to Ms. Gipson. Bank of America charged Ms. Gipson multiple overdraft fees.   For example, based on information and belief, Ms. Gipson was charged thirteen overdraft fees on June 16 and 17, 2009,

in the amount of $35.00 each, for a total of $455.00.  Based on information and belief, the

overdraft fees were based on the following ordering of transactions:

### Balance Sheet per Bank of America Reordering Scheme
### (Debits Processed from Highest to Lowest)

| | | Debits | Fees | Balance |
|---|---|---|---|---|
| | Beginning Balance on 6/15/09: | | | $1,007.65 |
| **Date Posted** | **Debit Description** | | | |
| 6/15/09 | Check 6774 | 425.00 | | 582.65 |
| 6/15/09 | Check 6740 | 300.00 | | 282.65 |
| 6/15/09 | 21 Century Spdy | 174.02 | | 108.63 |
| 6/15/09 | Alltel | 115.34 | | -6.71 |
| 6/15/09 | Corner Market (6/13) | 41.95 | | -48.66 |
| 6/15/09 | Exxon Mobil (6/13) | 10.14 | | -58.80 |
| 6/15/09 | Taco Bell (6/13) | 9.25 | | -68.05 |
| 6/15/09 | Exxon Mobil(6/14) | 7.73 | | -75.78 |
| 6/15/09 | Raceway (6/11) | 5.73 | | -81.51 |
| 6/15/09 | Exxon Mobil (6/12) | 5.40 | | -86.91 |
| 6/15/09 | Subway (6/11) | 5.29 | | -92.20 |
| 6/15/09 | Church's (6/12) | 5.19 | | -97.39 |
| 6/15/09 | 21 Century Spdy | 3.25 | | -100.64 |
| 6/15/09 | Corner Market (6/13) | 2.00 | | -102.64 |
| 6/16/09 | Deposit $250.00 | | | 147.36 |
| 6/16/09 | Overdraft Fee | | 35.00 | 112.36 |
| 6/16/09 | Overdraft Fee | | 35.00 | 77.36 |
| 6/16/09 | Overdraft Fee | | 35.00 | 42.36 |
| 6/16/09 | Overdraft Fee | | 35.00 | 7.36 |
| 6/16/09 | Overdraft Fee | | 35.00 | -27.64 |
| 6/16/09 | Overdraft Fee | | 35.00 | -62.64 |
| 6/16/09 | Overdraft Fee | | 35.00 | -97.64 |
| 6/16/09 | Overdraft Fee | | 35.00 | -132.64 |
| 6/16/09 | Overdraft Fee | | 35.00 | -167.64 |
| 6/16/09 | Overdraft Fee | | 35.00 | -202.64 |
| 6/16/09 | Check 6775 | 68.90 | | -271.54 |
| 6/16/09 | Check 6777 | 21.95 | | -293.49 |
| 6/16/09 | CVS (6/15) | 4.86 | | -298.35 |
| 6/17/09 | Overdraft Fee | | 35.00 | -333.35 |
| 6/17/09 | Overdraft Fee | | 35.00 | -368.35 |
| 6/17/09 | Overdraft Fee | | 35.00 | -403.45 |
| 6/18/09 | Deposit (Tyler Pipe Company) $1,178.82 | | | 775.47 |
| | | | **Total Fees:** | **$455.00** |